2014 ND 32

In the Interest of G.R., a Child.

State of North Dakota, Petitioner and Appellee

v.

G.R., a child, C.R., n/k/a C.S., mother, and W.R., father, Respondents

W.R., father, Appellant.

No. 20130376.

Supreme Court of North Dakota.

Feb. 13, 2014.

Lee M. Grossman, State's Attorney, Valley City, N.D., for petitioner and appellee; submitted on brief.

Mark T. Blumer, Fargo, N.D., for appellant; submitted on brief.

KAPSNER, Justice.

[¶ 1]   W.R., the father, appeals from a juvenile court order terminating his parental rights to the child, G.R. W.R. argues the juvenile court erred in finding the causes and conditions of the deprivation were likely to continue and finding the termination of his parental rights was necessary to avoid serious physical, mental, or emotional harm to the child.   We affirm.

I

[¶ 2]   The child was born on April 2, 2008.   The child's parents lived in Illinois at the time of her birth, but the child and her mother later moved to North Dakota. On March 31, 2012, the child was removed from the mother's home and LaMoure County Social Services placed her in foster care.   On September 6, 2012, social services placed the child with W.R. in Illinois for a home study, but the placement was terminated on November 29, 2012.

[¶ 3]   On May 20, 2013, the State petitioned to terminate W.R.'s parental rights. A termination hearing was held on September 19, 2013.   The State offered testimony from a number of witnesses, includ-

ing a social worker from LaMoure County Social Services, the child's counselor, the child's foster parent, and the guardian ad litem. W.R. also testified.

[¶ 4] On October 15, 2013, the juvenile court granted the petition and terminated W.R.'s parental rights. The court found the child was deprived and the deprivation was likely to continue, because W.R. has shown an inability to provide stable housing and care for the child and himself, he has a lengthy criminal history with multiple periods of incarceration, he has consistently shown a disregard for rules, and his inability to provide a stable home and care for the child is likely to continue. The court also found reasonable efforts were made to prevent the removal of the child from the home, it was contrary to the child's welfare to return to W.R.'s home, and termination was in the child's best interests.

## II

[¶ 5] Section 27–20–44(1), N.D.C.C., authorizes a juvenile court to terminate a person's parental rights if "[t]he child is a deprived child and the court finds . . . [t]he conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm[.]" The petitioner must establish all of the elements for termination by clear and convincing evidence. *In re A.L.*, 2011 ND 189, ¶ 8, 803 N.W.2d 597. Clear and convincing evidence is evidence that leads to a firm belief or conviction the allegations are true. *In re C.N.*, 2013 ND 205, ¶ 6, 839 N.W.2d 841.

[¶ 6] On appeal, we will not overturn a juvenile court's findings of fact

unless the findings are clearly erroneous. *C.N.*, 2013 ND 205, ¶ 7, 839 N.W.2d 841. A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, there is no evidence to support it, or if we are left with a definite and firm conviction a mistake has been made. *Id.*

### A

[¶ 7] W.R. argues there was not clear and convincing evidence the conditions and causes of the deprivation were likely to continue.

[¶ 8] The petitioner must establish, by clear and convincing evidence, that the child is deprived and that the causes and conditions of deprivation are likely to continue. N.D.C.C. § 27–20–44(1)(c)(1); *see also C.N.*, 2013 ND 205, ¶ 6, 839 N.W.2d 841. A child is deprived if the child:

Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents, guardian, or other custodian. . . .

N.D.C.C. § 27–20–02(8)(a). A parent's conduct in raising their child must satisfy the minimum standard of care the community will tolerate. *In re K.B.*, 2011 ND 152, ¶ 10, 801 N.W.2d 416. "A parent must be able to demonstrate present capability, or capability within the near future, to be an adequate parent." *C.N.*, at ¶ 9 (quoting *In re K.L. and M.S.*, 2008 ND 131, ¶ 23, 751 N.W.2d 677).

[¶ 9] Evidence of past deprivation is not enough to determine whether the causes and conditions of deprivation

will continue; rather, there must also be prognostic evidence. *In re A.B.*, 2010 ND 249, ¶ 22, 792 N.W.2d 539. Prognostic evidence is that which "forms the basis for a reasonable prediction as to future behavior." *In re A.S.*, 2007 ND 83, ¶ 19, 733 N.W.2d 232 (quoting *In re L.F.*, 1998 ND 129, ¶ 17, 580 N.W.2d 573). Evidence of a parent's background or history may be considered in determining whether the deprivation is likely to continue. *K.B.*, at ¶ 12. "A parent's past conduct can form the basis for a reasonable prediction of a parent's future behavior." *A.B.*, at ¶ 16. The court may also consider the amount of contact the parent has had with the child. *Id.* at ¶ 22. A parent's lack of cooperation with social service agencies is pertinent and indicates the causes and conditions of deprivation are likely to continue. *In re T.H.*, 2012 ND 38, ¶ 29, 812 N.W.2d 373; *A.B.*, at ¶ 22. Prognostic evidence also includes reports and opinions of the professionals involved in the case. *A.S.*, at ¶ 19.

[¶ 10] The juvenile court found the child is deprived and will continue to be deprived if she is returned to W.R.'s custody. The court found W.R. received custody of the child for a short time during a home study, but the short custody had significant negative impacts on the child, including a negative change in her behavior, she exhibited sexualized behavior beyond what a five-year-old child should know, and she was afraid to be left alone at night. The court also found W.R. has shown an inability to provide stable housing, shelter, and care for the child and for himself; he has a consistent twenty-six-year history of criminal convictions and incarceration; he is currently incarcerated; and he may be released from prison sometime between January 2014 and July 2015. The court found W.R. has consistently shown a disregard for the rules, which is evidenced by his criminal history and his inability to maintain housing. The court found he was given an opportunity for stable housing and employment at a transitional living center in Chicago while the child was in his care, he deliberately broke the living center's rules, he was removed from the living center, and he and the child became homeless. Based on these findings, the court found:

Failing to provide a consistent home, shelter and care is deprivation and it is likely to continue based on [W.R.'s] history. It is likely that [W.R.] will be incarcerated again after he is released from his current sentence. His significant criminal history reveals that he is incarcerated every few years for sentences of two or three years. This pattern is consistent for the last approximately 25 years. [W.R.] cannot care for [the child] when he is in prison. [The child] will be deprived because [W.R.] will very likely end up in prison again.

[W.R.] has shown a significant lack of follow through and made no real progress in getting stable housing. [W.R.] has been informed of the obstacles to reunify with [the child]. He has not been consistently involved with social services or consistently in contact with [the child]. [W.R.] has not made any phone calls to [the child] since the end of April 2013. [W.R.] claims he will do whatever is required to get [the child] back but his words fall flat when compared to his actions—breaking the rules at the living center and being less than candid with social services.

[¶ 11] The record supports the court's finding that W.R. has been unable to provide the child with a consistent home and care in the past and that the instability is

likely to continue. The court's findings about instability were based on W.R.'s criminal history and the likelihood that he will reoffend and will not be available to care for the child. Barbara Ritter, a social worker for LaMoure County Social Services, testified that W.R. has a long criminal history, including convictions for burglary, armed robbery, controlled substances, and theft. There was evidence W.R. was incarcerated for retail theft at the time of the hearing and would be released sometime between January 2014 and July 23, 2015. W.R. testified he committed that offense in early 2013, after social services became involved with the family and had placed the child in foster care. W.R. also testified that his criminal history includes convictions for retail theft in 2006, theft in 2004, robbery in 2001, possession of a controlled substance in 1999, unlawful delivery of a stolen vehicle in 1993, controlled substances in 1993, retail theft in 1992, and robbery and other charges in 1987. He testified that each of these convictions had sentences that included time in prison. W.R.'s criminal history indicates his pattern of convictions and incarceration will likely continue in the future. The evidence supports the court's finding that the causes and conditions of deprivation are likely to continue. *See C.N.*, 2013 ND 205, ¶ 11, 839 N.W.2d 841 (a parent cannot provide proper parental care while incarcerated).

[¶ 12] The record also supports the court's finding that W.R. has consistently shown a disregard for rules to the child's detriment, he has failed to cooperate with social service agencies, and he has not had consistent contact with the child. There was evidence W.R.'s contact with the child was often sporadic and he had not had any contact with the child since April 2013. Ritter testified that social services informed W.R. of the things he needed to do to be reunited with the child, including obtaining a consistent place to live for a period of six months, completing a parenting assessment and following any recommendations, and attending a parenting class. Ritter testified W.R. completed the parenting assessment and class, but he was unable to secure stable housing and continued to move from place to place. There was evidence social services placed the child with W.R. in Illinois on September 6, 2012. Ritter testified that W.R. lost his job and became homeless within two weeks of the child being placed with him, he started moving from place to place, and she was not sure where he and the child were at any given time. There was evidence W.R. and the child began living in a transitional living center on October 24, 2012, and the center had a program that provided assistance with employment, child care, and finding a permanent home. Ritter testified W.R. was evicted from the transitional living center on November 29, 2012, because he violated the program's rules, and the child had to be removed from his care and placed in a foster home in North Dakota because he and the child were homeless. Ritter testified W.R. was unable to secure consistent employment and was fired from one job after he stole money. The evidence shows W.R. is unable to provide a stable home for the child even with the help of social service agencies and he has not made any progress toward reunification with the child. This evidence and the evidence of W.R.'s criminal history shows he consistently disregards rules, which was one of the causes of the deprivation and is evidence the deprivation will continue.

[¶ 13] The opinions of the professionals involved in the case also support the court's finding that the deprivation is likely

to continue. Ritter testified that she believes the deprivation will continue if parental rights are not terminated because the situation has not changed, W.R. continues to lack stability, he is unemployed, and parenting issues have not been resolved.

[¶ 14] There was clear and convincing prognostic evidence the deprivation is likely to continue if W.R.'s rights are not terminated. We conclude the court's finding that the deprivation is likely to continue is not clearly erroneous.

## B

[¶ 15] W.R. argues the juvenile court erred in finding there was clear and convincing evidence termination was necessary to avoid serious physical, mental, or emotional harm to the child.

[¶ 16] Upon a showing that the child is deprived and the causes and conditions of deprivation are likely to continue, the petitioner must also prove the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm. N.D.C.C. § 27–20–44(1)(c)(1); *see also A.B.*, 2010 ND 249, ¶ 31, 792 N.W.2d 539. The risk of future harm may be based on evidence of past harm and may also be established by prognostic evidence that the parent's current inability to care for the child will continue long enough to make the child's successful assimilation into a family improbable if the parent's rights are not terminated. *A.B.*, at ¶ 31.

[¶ 17] The juvenile court did not explicitly find the child is suffering or will likely suffer serious harm in the future. However, the court addressed this element in its other findings.

[¶ 18] The court found it was contrary to the child's welfare to return to her father's home. The court said it was not going to speculate about W.R.'s release from incarceration because there were other factors for terminating his rights, including his inability to secure employment and housing, his consistent disregard for the rules, his criminal history, and the likelihood that he will be incarcerated again in the future. The court found W.R. cannot care for the child when he is incarcerated and the child would become homeless every time W.R. became homeless if she were in his custody. The court's findings indicate the child would likely spend a significant amount of time in foster care if W.R.'s parental rights were not terminated, which would make her successful assimilation into a family improbable. The court found the child would likely suffer serious harm in the future if W.R.'s rights were not terminated and the evidence supports the finding.

[¶ 19] The court also made findings about harm the child has already suffered. The court found the child was negatively impacted by the time she spent in W.R.'s care and there was a negative change in the child's behavior after she returned to the foster home, including that she exhibited sexualized behavior beyond what any five-year-old child should know and she was often afraid to be alone at night. Ritter testified G.R. exhibited sexualized behaviors and was afraid to go to bed at night after she returned from staying with W.R. The child's foster parent also testified that the child exhibited some sexualized behaviors after staying with W.R. She also testified the child was very afraid that she would be left alone at night because her father left her alone at night on one occasion and it took the child months to realize she would not be left alone. The child's counselor testified she began seeing the child because the child showed some

sexualized behaviors, difficulty with adjustment, and emotional outbursts. Ritter testified the child would likely suffer further harm if she is placed with W.R., the child suffers from post-traumatic stress problems, and termination is in the child's best interests. The evidence supports the court's findings.

[¶ 20] The court implicitly found that the child is suffering and will probably suffer serious harm if W.R.'s rights are not terminated. We conclude there was clear and convincing evidence supporting the court's findings, and the findings are not clearly erroneous.

### III

[¶ 21] We conclude the court's findings are not clearly erroneous, and we affirm the juvenile court's order terminating W.R.'s parental rights.

[¶ 22] GERALD W. VANDE WALLE, C.J., MARY MUEHLEN MARING, S.J., DANIEL J. CROTHERS, and DALE V. SANDSTROM, JJ., concur.

[¶ 23] The Honorable Lisa Fair McEvers was not a member of the Court when this case was heard and did not participate in this decision. Surrogate Judge Mary Muehlen Maring, sitting.